## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LOU ANN TYLWALK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION NO. 2004-222J |
| v. | ) |
| | ) |
| PRUDENTIAL INSURANCE | ) JUDGE GIBSON |
| COMPANY and RELIANT ENERGY, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

### SYNOPSIS

This matter comes before the Court on a Motion for Summary Judgment filed by the Plaintiff, Lou Ann Tylwalk [hereinafter "Tylwalk"] (Document No. 11), and a Motion for Summary Judgment filed by the Defendants, Prudential Insurance Company [hereinafter "Prudential"] and Reliant Energy [hereinafter "Reliant Energy"] (Document No. 14). This Court has jurisdiction in this case pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1). Venue is proper under 29 U.S.C. § 1132(e)(2).

### BACKGROUND

This case was filed pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* [hereinafter "ERISA"]. The key facts are set out in a Stipulation agreed to by the parties. Document No. 10. As of August 24, 2001, Tylwalk was a regular full-time employee of Reliant Energy and a member of Local 459 of the International Brotherhood of Electrical Workers AFL-CIO. Document No. 10, p. 1, ¶ 1. She was employed as a Central Control Room Operator at the Shawville

1

Electric Generation Plant, and her duties included operating the controls of the generators, boilers and other major equipment for the purpose of generating electricity at the station. *Id.*, ¶ 2. She was paid the highest wage under the collective bargaining agreement, which amounted to $59,629.90 in 2001. *Id.*, p. 2, ¶ 3. On August 24, 2001, Tylwalk was occupying a tent with her husband and children in Parker Dam State Park, near Clearfield, Pennsylvania. *Id.*, ¶ 4. A large tree fell onto the tent while Tylwalk was inside of it, causing her to suffer severe injuries. *Id.*

Under the collective bargaining agreement, the employees of Reliant Energy were provided with life insurance. *Id.*, ¶ 5. This insurance was divided into Part A and Part B.[1] *Id.* Part A included a $20,000.00 disability payment for any employee who became "totally and permanently disabled" as set forth in the plan before reaching the age of sixty. *Id.*, ¶ 6. This payment was payable in the form of a lump sum at the employee's option. *Id.* This Reliant Energy plan was the same as the plan adopted by Sithe Energies, Inc., the successor to Reliant Energy. *Id.*, ¶ 7. The Sithe Energies plan governs the instant case. *Id.*

Tylwalk was born on October 25, 1958, and she was forty-three years of age at the time of her injury. *Id.*, ¶ 8. Consequently, she was eligible to receive the $20,000.00 payment if she were determined to be "totally and permanently disabled." *Id.*, pp. 2-3, ¶ 8. She applied for the disability benefit, but her application was denied through letters from the plan administrator dated September 22,

---

[1] Part B of the plan included the continuation of Tylwalk's group life insurance in the amount of $89,000.00. Since Tylwalk was found to be totally disabled, her claim for the benefits provided under Part B was approved as of July 10, 2003, and she was able to discontinue making premium payments as of that date. Joint Exhibit, p. 000012. Since Tylwalk was able to obtain this benefit, only the $20,000.00 lump sum provided under Part A of the plan is at issue in this case.

2

2003, December 22, 2003, and June 1, 2004.[2] *Id.*, p. 3, ¶ 9. The relevant benefit was covered by ERISA

Plan Number 501 of Reliant Energy, which provided that the claim review would be handled by

Prudential's plan administrator as follows:

> The Prudential Insurance Company of America as Claims Administrator has the sole
> discretion to interpret the terms of the Group Contract, to make factual findings, and to
> determine eligibility for benefits. The decision of the Claims Administrator shall not
> be overturned unless arbitrary and capricious.

*Id.*, pp. 3-4, ¶ 12. Prudential also funded the plan through insurance. *Id.*, p. 4, ¶ 12. The parties have

stipulated that the proper standard of review in this case is the "sliding scale of heightened scrutiny of

the arbitrary and capricious standard" described in *McLeod v. Hartford Life and Accident Ins. Co.*, 372

F.3d 618, 623 (3d Cir. 2004). *Id.*, ¶ 13. They have also submitted a Joint Exhibit, which they agree was

the record before the plan administrator. *Id.*, p. 3, ¶ 10.

## STANDARD OF REVIEW

Tylwalk has brought this action pursuant to 29 U.S.C. § 1132(a)(1)(B). Therefore, the Court

must apply the standard enunciated by the U.S. Supreme Court in *Firestone Tire & Rubber Co. v.*

*Bruch*, 489 U.S. 101, 109 S. Ct. 948, 103 L. Ed.2d 80 (1989). In *Firestone Tire*, the Supreme Court

stated as follows:

> As this case aptly demonstrates, the validity of a claim to benefits under an ERISA plan
> is likely to turn on the interpretation of the terms in the plan at issue. Consistent with
> established principles of trust law, we hold that a denial of benefits challenged under §
> 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives
> the administrator or fiduciary discretionary authority to determine eligibility for benefits

---

[2] Tylwalk's claim was initially denied on September 22, 2003. Joint Exhibit, p. 000011. Her first request for
reconsideration was denied on December 22, 2003, and her second request for reconsideration was denied on June 1, 2004.
Joint Exhibit, pp. 000003, 000047.

3

or to construe the terms of the plan. Because we do not rest our decision on the concern for impartiality that guided the Court of Appeals, we need not distinguish between types of plans or focus on the motivations of plan administrators and fiduciaries. Thus, for purposes of actions under § 1132(a)(1)(B), the *de novo* standard of review applies regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest. Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.

*Firestone Tire*, 489 U.S. at 115, 109 S. Ct. at 956-57, 103 L. Ed.2d at 95, (internal quotation marks, citations and brackets omitted). The U.S. Court of Appeals for the Third Circuit has provided some direction as to how a court should weigh a conflict of interest as a factor in determining whether there was an abuse of discretion. In *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377 (3d Cir. 2000), the Court of Appeals explained that "when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." *Pinto*, 214 F.3d at 378. The Court of Appeals elaborated on this standard in *McLeod*:

This heightened standard of review uses a sliding scale approach, intensifying the degree of scrutiny to match the degree of conflict, considering, among other factors, the exact nature of the financial arrangement between the insurer and the company. When applying this standard, a court is directed to consider the nature and degree of apparent conflicts and shape its review accordingly, with the result that the less evidence there is of conflict on the part of the administrator, the more deferential the standard becomes.

*McLeod*, 372 F.2d at 623, (internal citations and quotation marks omitted). The parties are in agreement that this heightened standard of review is applicable in the instant case. Document No. 10, p. 4, ¶ 13. The record before the Court consists of the Stipulation filed by the parties and the record before

4

Prudential at the time of its final denial of Tylwalk's claim. *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997); *Orvash v. The Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.*, 222 F.3d 123, 129, n. 7 (3d Cir. 2000).

## DISCUSSION

### A.    PROPER DEFENDANTS

Before reaching the question of whether Prudential's denial of Tylwalk's claim for the $20,000.00 payment was arbitrary and capricious, the Court must address a preliminary matter raised by Reliant Energy. Reliant Energy claims that it is not a proper defendant for an action brought pursuant to 29 U.S.C. § 1132(a)(1)(B). Document No. 14, p. 5, ¶ 22. In support of its contention, Reliant Energy argues that only the plan itself or a fiduciary of the plan may be a proper defendant in a suit filed under § 1132(a)(1)(B). Document No. 15, p. 11.

In *Harris Trust and Sav. Bank, Etc. v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 120 S. Ct. 2180, 147 L. Ed.2d 187 (2000), the U.S. Supreme Court held that an action for equitable relief could be brought under 29 U.S.C. § 1132(a)(3) against a nonfiduciary party in interest to a transaction barred by § 1106(a). *Harris Trust*, 530 U.S. at 241, 120 S. Ct. at 2184, 147 L. Ed.2d at 193-194. In actions brought pursuant to § 1132(a)(1)(B), however, court decisions have limited the class of proper defendants to either the plan itself or fiduciaries with control over the plan's administration. Some courts have held that only plans themselves can be named as defendants, while others have held that both plans and fiduciaries can be named as defendants.[3] It is apparent from the language of *Curcio v.*

---

[3] Compare *Everhart v. Allmerica Fin. Life Ins. Co.*, 275 F.3d 751 (9ᵗʰ Cir. 2001), *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1490 (7ᵗʰ Cir. 1996), and *Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323 (9ᵗʰ Cir. 1985) (limiting the category of proper defendants to include only the plans themselves) with *Mein v. Carus Corporation*, 241 F.3d

*John Hancock Mut. Life Ins. Co.*, 33 F.3d 226 (3d Cir. 1994), that the U.S. Court of Appeals for the Third Circuit falls into the latter category. In *Curcio*, the Court of Appeals determined that a fiduciary could be named as a proper defendant in an ERISA action. *Curcio*, 33 F.3d at 234-35. The question of whether suits could be brought against parties other than plans and fiduciaries was not reached, given that the entity involved was found to be a fiduciary. *Id.* The Court of Appeals did, however, caution that "the district courts should not easily fashion additional ERISA claims and parties outside congressional intent under the guise of federal common law." *Id.* at 235. Consequently, *Curcio* has been interpreted as limiting the category of potential § 1132(a)(1)(B) defendants to plans and fiduciaries. *Brown v. Continental Baking Co.*, 891 F. Supp. 238, 240 (E.D. Pa. 1995). For this reason, the Court interprets *Curcio* in a similar manner and holds that only plans and fiduciaries are proper defendants in actions brought pursuant to § 1132(a)(1)(B).

ERISA defines the term "fiduciary." The statute states, in pertinent part, as follows:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). In the instant case, Sithe Energies, Inc., the successor to Reliant Energy, is listed as the Plan Administrator. Joint Exhibit, p. 000434. As Reliant Energy points out, however,

---

581 (7th Cir. 2001), *Layes v. Mead Corp.*, 132 F.3d 1246, 1249 (8th Cir. 1998), *Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir. 1997), and *Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir. 1988) (broadening the category of proper defendants to include fiduciaries as well as plans).

Prudential Insurance Company of America is listed as the Claims Administrator, with "the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits." *Id.*, p. 000435. Reliant Energy relies on *Earnest v. Metro. Life Ins. Co.*, 291 F. Supp.2d 1327 (M.D. Fla. 2003), in support of its assertion that it is not a proper defendant under § 1132(a)(1)(B). Document No. 15, pp. 11-13. In *Earnest*, the U.S. District Court for the Middle District of Florida determined that a company which had delegated all responsibility for claims administration to an insurance company was not a proper defendant in an ERISA benefits action. *Earnest*, 291 F. Supp.2d at 1337-38. The parties in this case have stipulated to the language of the plan, which unambiguously gives Prudential the *sole* discretion to interpret the contract, make factual findings, and determine eligibility for benefits. Document No. 10, pp. 3-4, ¶ 12. Under these circumstances, it is clear that Reliant Energy retained no discretionary authority, responsibility or control with respect to the benefits sought by Tylwalk. Consequently, the Court is convinced that Reliant Energy is not a proper defendant in this action.

## B. APPLICATION OF THE *MCLEOD* STANDARD

As noted earlier, the parties agree that the applicable standard in this case is the sliding scale of heightened scrutiny discussed in *McLeod*. Document No. 10, p. 4, ¶ 13. This is because Prudential funds the plan through insurance. *Id.*, ¶ 12. The issue in this case is whether Prudential's determination that Tylwalk was not totally and permanently disabled, and therefore not entitled to the $20,000.00 lump sum available under Part A of the plan, was arbitrary and capricious.

At the outset, the Court looks to the language of the plan, which defines the terms "total disability" and "total and permanent disability." The relevant portion of the plan states as follows:

7

"Total Disability": You are Totally Disabled when:

(1) you are not working at any job for wage or profit; and

(2) due to Sickness, Injury or both, you are not able to perform for wage or profit, the material and substantial duties of any job for which you are reasonably fitted by your education, training or experience.

"Total and Permanent Disability": You are Totally and Permanently Disabled when:

(1) Total Disability exists; and

(2) Your Total Disability is such that condition (2) of the above "Total Disability" definition will be met for the rest of your lifetime.

Joint Exhibit, p. 000419. The parties agree that, at the time of Prudential's decision, Tylwalk was totally disabled. In fact, Prudential approved the continuation of her group life insurance in the amount of $89,000.00 as of July 10, 2003, and she was able to discontinue making premium payments as of that date. *Id.*, p. 000012. The disagreement in this case concerns only the question of whether Prudential acted in an arbitrary and capricious manner in determining that Tylwalk had not demonstrated the *permanence* of her total disability. Consequently, the Court's inquiry is quite narrow. With that in mind, the Court now turns to the evidence regarding the nature and extent of Tylwalk's injuries.

Prudential does not dispute that Tylwalk sustained severe head injuries when the tree collapsed on the tent that she was occupying. Dr. Guy Catone, who operated on her, opined on May 5, 2003, that she had suffered a closed head injury, multiple facial skeletal fractures, a fractured right frontal bone and supraorbital rim, nasal bone fractures, naso-orbital ethmoidal fractures, bilateral zygomaticomaxillary complex fractures, blow out fracture of the right orbital floor, Le Fort I maxillary fracture, fracture of the right coronoid process of the mandible, and facial and scalp lacerations and

8

abrasions." *Id.*, p. 000059.  According to Dr. Catone, Tylwalk was airlifted to Allegheny General Hospital after the accident, where she underwent surgery to address her injuries. *Id.*  One week after the accident, a bicoronal flap of the skull was developed, and the right-sided Le Fort fracture was repaired. *Id.*  The surgery resulted in the repair of the right zygomatic bone body and arch fracture, as well as the repair and reduction of the right supraorbital fracture of the frontal bone. *Id.*  Tylwalk's nasal bridge was reconstructed with Leibinger mesh. *Id.*

Tylwalk returned to the operating room on September 10, 2001, so that the blow out fracture of the left orbital floor and blow in fracture of the right orbital floor could be repaired. *Id.*  Subsequently, she was discharged from the hospital and returned home. *Id.*  Follow-up care revealed that she suffered from an extra-articular ankylosis of the right jaw joint secondary to a fracture of the coronoid process. *Id.*  As a result, she had difficulty opening her mouth. *Id.*  On November 2, 2001, she was readmitted to the hospital so that a right coronoidectomy could be performed. *Id.*  After the surgery, Dr. Catone reported that Tylwalk was able to open her mouth, masticate food, and articulate words. *Id.*  Although her condition appeared to be improving, Tylwalk continued to suffer from residual enopththlamos of the right orbit, decreased width of the left palpebral fissure, and post-traumatic resorption of the upper jaw. *Id.*, p. 000060.  She was admitted to Allegheny General Hospital again on February 4, 2002, at which time "the lack of bone in the upper jaw was managed by grafting corticocancellous bone from the posterior iliac crest (right) to the maxillary sinuses bilaterally." *Id.*  According to Dr. Catone, "[i]t was not possible to place dental implants into the upper jaw because of the lack of bone to stabilize the dental implants needed during the process of osseousintegration of these fixtures." *Id.*

9

On June 14, 2002, Tylwalk was admitted to the Short Procedure Unit at Allegheny General Hospital. *Id.* On that occasion, she had "a right-sided cheek implant placed, a surgical browlift to elevate the eyebrows, lysis of adhesions around the right frontozygomatic suture and right inferior orbital rim with removal of the bone plate and screws." *Id.* In addition, a Silastic implant was placed into the right orbital floor for the purpose of elevating the right globe. *Id.* Tylwalk was admitted again on September 27, 2002, in order to undergo procedures to facilitate the rebuilding of her upper jaw. *Id.* After accepting bone grafts, Tylwalk had multiple dental implants placed in her maxilla on April 25, 2003. *Id.* Although Dr. Catone found the prognosis of these dental implants to be good, Tylwalk continued to have enophthalmos of the right orbit and eyeball. *Id.* As of May 5, 2003, Dr. Catone was of the opinion that while the prognosis for Tylwalk's facial injuries was good, she would nevertheless "be left with some residual disabilities related to moderate double vision in the right eye." *Id.* He predicted that her visual and psychological problems would be permanent, but that they would improve "somewhat" over time. *Id.*

The Joint Exhibit also includes information from Ronald Lingle, who served as Tylwalk's psychologist. *Id.*, pp. 000046, 000062-65. On May 16, 2003, in a letter to Tylwalk's attorney, Lingle indicated that Tylwalk suffered from both mood disorder secondary to traumatic brain injury and cognitive disorder. *Id.*, p. 000064. As a result, she had difficulty with working memory, spatial reasoning, speeded response, and processing multiple sources of information. *Id.* In the prognosis section of his report, Lingle stated as follows:

> This psychologist has met with Lou Ann a total of 35 times over the last 14 months for treatment of symptoms of depression, anxiety, family stress, and decreased cognition that were not a part of her life before the traumatic head injury of August 2001.

10

Although this examiner is not a Neuropsychologist, it is obvious that Lou Ann Tylwalk cannot return to her job as a control-room operator now or in the future. As it has been over a year and a half since the accident and brain injury, with very little further cognitive recovery expected from this point, it would be dangerous to subject Lou Ann and/or others at the plant to the possibility of mistakes in judgment resulting from this injury. Her continued reconstructive surgical status combined with her ongoing mood fluctuations would also preclude any other gainful work in the near future (2-3 years). Further prognosis past this point will require neuropsychological, psychological, and occupational testing to determine physical, cognitive, and emotional readiness for employment.

Lou Ann, Charles, and I are hopeful that she can eventually return to the workforce in some capacity as her past excellent work record is a source of pride and self-esteem for Lou Ann. She is putting a great deal of effort into putting her life back together since the accident, however residual cognitive impairments and recurrent exacerbations of depression and anxiety are preventing her from attaining a fully independent life.

*Id.*, pp. 000064-65. Lingle's letter obviously contemplated the possibility that Tylwalk would someday

be able to work again.

On March 23, 2004, Lingle sent a second letter to Tylwalk's attorney. *Id.*, p. 000046. In that

letter, he sought to clarify his earlier letter of May 16, 2003:

I would like to clarify that when that report was written, Lou Ann was having a difficult time grieving the loss of her former active and working life and I did not want to imply in a document that she may have access [to], that she could never work in any capacity, ever again. As Lou Ann was/is on two antidepressants, [an] anti-anxiety pill, and a sleeping pill, I wanted to express some hope in my letter to you, even though **I do not now and never believed that she would work in any capacity again.** Please understand that in my profession, we write every note and letter as if the patient is reading them. As you know, they own the medical record and can see it at any time by law.

Therefore, as Lou Ann Tylwalk's treating psychologist, it is my opinion that Lou Ann Tylwalk is totally and permanently disabled from performing any work in any capacity for the remainder of her life.

11

*Id.* At the time of its final decision, Prudential had both of these letters before it, as well as Dr. Catone's report of May 5, 2003. *Id.*, p. 000004.

Tylwalk points out that Prudential did not consider any medical evidence other than that which was submitted by her. Document No. 12, p. 9. In so stating, she appears to argue that Prudential was under a duty to obtain independent medical evidence before making a determination with respect to her claim. The inquiry before the Court, however, is whether Prudential's "decision might have been arbitrary and capricious *given the information available.*" *Pinto*, 214 F.3d at 394 n.8, (emphasis added). Prudential had no legal duty to conduct an independent investigation. *Id.*

In support of her Motion for Summary Judgment, Tylwalk argues that Prudential acted in an arbitrary and capricious manner in rejecting the conclusion expressed in Lingle's second letter. Document No. 12, p. 13. She contends that Prudential's decision that she was not "totally and permanently" disabled contradicted its determination that she was "totally disabled." *Id.* This argument is unpersuasive. Aside from Lingle's letter of March 23, 2004, Tylwalk has presented no evidence regarding the duration of her disability. The Court is not convinced that Prudential acted in an arbitrary or capricious manner in discounting Lingle's later letter, which contradicted his own prior statements. While the parties disagree as to where on the sliding scale of heightened scrutiny this case falls, they have stipulated that this case falls somewhere on that scale. Document No. 10, p. 4, ¶ 13. Consequently, it is clear that this Court's review is not *de novo*, and that *some* deference must be shown to Prudential's determination.[4] Under these circumstances, one conclusory statement from a medical

---

[4] This case is similar to *McLeod* in an important respect besides the applicability of the sliding standard of review. In *McLeod*, the Court of Appeals noted that the record was not clear as to the precise nature of the funding arrangement of the plan at issue. *McLeod*, 372 F.3d at 623-24. The same is true here. While the parties have stipulated that "Prudential

professional, which contradicts his own prior statements, cannot itself overcome even a minimal degree of deference owed to Prudential's findings in accordance with the plan. For this reason, the Court is not convinced that Tylwalk has produced sufficient evidence to disturb Prudential's determination that she was not totally and *permanently* disabled.

Tylwalk relies on *Pinto* for the proposition that Prudential wrongfully relied on some of Lingle's statements while rejecting his opinion that Tylwalk's disability was permanent. Document No. 12 pp. 13-14. In *Pinto*, however, the Court of Appeals noted that, "whenever it was at a crossroads," the insurance company chose the decision which was disfavorable to the plaintiff. *Pinto*, 214 F.3d at 394. That is not the case here. Prudential determined that Tylwalk was totally disabled, denying her claim only to the extent that it was based on an assertion of permanent disability. Under these circumstances, it cannot be said that Prudential has demonstrated a propensity to deny Tylwalk's claims in an unreasonable manner.

Prudential's position is buttressed by the decision of the U.S. Court of Appeals for the Fifth Circuit in *Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329 (5th Cir. 2001). In *Gooden*, the Court of Appeals explained that an insurance company did not abuse its discretion in failing to give

---

funds the plan through insurance[,]" the Court is presented with very little information about the funding arrangement. Document No. 10, p. 4, ¶ 12. For this reason, it is difficult for the Court to determine where on the "sliding scale of heightened scrutiny" this case belongs. As the Court of Appeals stated in *McLeod*, the applicable "heightened standard of review uses a sliding scale approach, intensifying the degree of scrutiny to match the degree of conflict, considering, among other factors, *the exact nature of the financial arrangement between the insurer and the company.*" *McLeod*, 372 F.3d at 623, (emphasis added). Without knowing the "exact nature of the financial arrangement," the Court cannot determine the precise extent to which the degree of scrutiny should be intensified. The purpose of the sliding scale approach, after all, is to weigh any conflict of interest on the part of Prudential as a factor in determining whether it has acted in an arbitrary or capricious manner. *Firestone Tire*, 489 U.S. at 115, 109 S. Ct. at 957, 103 L. Ed.2d at 95. Therefore, the conflict of interest simply factors into the Court's review of Prudential's decision under a deferential standard. It does not completely displace the deferential standard itself.

13

"overriding significance" to a physician's report where, as here, that report contradicted an earlier report from the same physician. *Gooden*, 250 F.3d at 333-34. The Court of Appeals also pointed out that the physician's subsequent report was not supported by medical evidence. *Id.* at 334 n.7.

The situation in the instant case is similar to *Gooden* in all relevant respects. Lingle's second letter contained no medical evidence whatsoever. Joint Exhibit, p. 000046. Instead, it consisted only of an explanation as to why his prior letter was unreliable. *Id.* As Prudential points out, Lingle's earlier letter was much more specific than his subsequent letter. Document No. 16, p. 5. In addition, Lingle's response to Prudential's questionnaire indicated that Tylwalk's ability to perform work in the future was uncertain. Joint Exhibit, p. 000241. He indicated that she should be reevaluated in 2-3 years, "after the maximum physical [and] emotional healing has taken place." *Id.* This was consistent with his letter of May 16, 2003. For this reason, Prudential did not act unreasonably in choosing to credit Lingle's earlier reports rather than his subsequent letter rejecting them.[5]

Dr. Catone also completed a questionnaire sent by Prudential. *Id.*, p. 000236. This questionnaire was completed on September 4, 2003. *Id.* Dr. Catone indicated that there would be little change in Tylwalk's double vision. *Id.* Nevertheless, he also reported that her condition had improved, and that she could engage in "limited physical activity." *Id.* In his earlier letter of May 5, 2003, he stated that the prognosis for Tylwalk's facial injuries was good, but that she would "be left with some

---

[5] The Court notes that Lingle's letter disavowing his prior statements came after Tylwalk's claim had been denied twice. In pointing this out, the Court does not impugn Lingle's integrity. Nevertheless, the question in this case is whether Prudential's decision to deny Tylwalk's claim was *arbitrary and capricious*. Given the fact that Lingle's letter of March 23, 2004, was not written until after Tylwalk's claim had been denied on September 22, 2003, and December 22, 2003, the Court cannot say that Prudential's decision to disregard the conclusory statements in that letter was arbitrary and capricious.

residual disabilities related to moderate double vision in the right eye." *Id.*, p. 000060. Although he described her vision and psychological problems as "permanent," he stated that they would be "somewhat improved over time." *Id.*, p. 000061. While it is clear that Dr. Catone found Tylwalk to be totally disabled at the time, reasonable minds could differ as to whether he believed her to be totally and permanently disabled for the remainder of her life.

Prudential also had access to the record of Tylwalk's claim for disability insurance benefits under Title II of the Social Security Act. In a decision dated February 28, 2003, Administrative Law Judge John J. Mulrooney II ("ALJ") determined that Tylwalk was disabled within the meaning of the Social Security Act. *Id.*, pp. 000032-38. His conclusion was based on a finding that Tylwalk's mental condition met the requirements of Listing 12.02, which is met "when the claimant has psychological or behavioral abnormalities associated with brain dysfunction, with a history and physical examination or laboratory tests demonstrating the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities."[6] *Id.*, p.

---

[6] The Social Security Administration has promulgated rules establishing a sequential evaluation process to determine whether a claimant is statutorily disabled under the Social Security Act. Judge Mulrooney determined that Tylwalk was statutorily disabled at the third step of the process. The U.S. Supreme Court recently summarized the five steps of the process used to evaluate these claims: "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c)." *Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80, 157 L. Ed.2d 333, 339-40 (2003) (footnotes omitted).

15

000035. Tylwalk argues that Prudential ignored the findings of the ALJ in determining that she was not totally and permanently disabled. Document No. 12, p. 14.

When the ALJ reviewed Tylwalk's case in the Social Security context, he determined that she was disabled within the meaning of the Social Security Act. The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). In order to be statutorily disabled under this standard, a claimant need not show that her disability is permanent. She need only show that it can be expected to last for a period of at least one year. The Social Security Act includes provisions governing the termination of disability benefits in cases in which a recipient's disability ceases to exist. 42 U.S.C. § 423(f); *Chrupcala v. Heckler*, 829 F.2d 1269, 1274 (3d Cir. 1987). It is clear that an award of disability insurance benefits under Title II cannot be equated with a finding of *permanent* disability.

The ALJ's decision in Tylwalk's case is distinguishable from her claim in the instant matter for another reason. The ALJ determined that she suffered from an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Joint Exhibit, p. 000033. Consequently, she was found to be statutorily disabled "on medical considerations alone." *Id.* The ALJ did not inquire into the question of whether she was capable of performing her past relevant work, or whether she was capable of performing other jobs existing in significant numbers in the national economy. *Barnhart v. Thomas*, 540 U.S. 20, 25, 124 S. Ct. 376, 379-80, 157 L. Ed.2d 333, 339-40 (2003). The process stopped when the ALJ determined that Tylwalk suffered from a listed impairment.

Under the plan presently at issue, one is deemed to be totally disabled when, due to sickness,

16

injury, or both, she is "not able to perform for wage or profit, the material and substantial duties of any job for which [she] is reasonably fitted by [her] education, training or experience." Joint Exhibit, p. 000419. This standard closely resembles the fifth step of the sequential evaluation process used by the Social Security Administration to determine a claimant's disability status under Titles II and XVI. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). Since the ALJ determined that Tylwalk's impairments met the requirements of a listed impairment, he did not determine whether her residual functional capacity enabled her to perform gainful work. Prudential, however, had to make such an inquiry in order to determine whether she was "totally disabled" within the meaning of the plan. Prudential, of course, determined that Tylwalk was "totally disabled," thereby approving her claim for the continuation of her group life insurance in the amount of $89,000.00. Joint Exhibit, p. 000012. Tylwalk was informed that this insurance would be continued if she remained totally disabled. *Id.* By concluding that Tylwalk was totally disabled, Prudential took the analysis beyond the inquiries made by the ALJ in the Social Security context.

The ALJ was never required to determine whether Tylwalk's disability was *permanent* enough to last for the duration of her life. He did note that Lingle did not expect Tylwalk to experience much cognitive recovery. *Id.*, p. 000035. Nevertheless, that is a far cry from determining that she was incapable of working for the rest of her life. For this reason, the ALJ's decision provides little support for Tylwalk's argument that Prudential acted in an arbitrary and capricious manner in determining that she was not "totally and permanently disabled."

*McLeod*, of course, is a relatively recent precedent. The Court is aware of only one published Third Circuit decision applying *McLeod*. In *Kosiba v. Merck & Co.*, 384 F.3d 58 (3d Cir. 2004), the

17

Court of Appeals determined that the District Court should have applied "a moderately heightened arbitrary and capricious standard of review." *Kosiba*, 384 F.3d at 61. The reason for this was the fact that the defendant had sought to have the individual claiming benefits undergo an independent medical examination. *Id.* Given that the prior medical opinions had buttressed the plaintiff's claim for benefits, the Court of Appeals believed that the defendant's request that the plaintiff undergo a medical examination reflected a desire on its part to obtain a basis for denial. *Id.* In addition, *Kosiba* involved a situation in which the plaintiff's long term disability benefits were terminated. *Id.* at 60.

The instant case does not raise similar concerns. Prudential did not seek an independent medical opinion for the purpose of contradicting the opinions of Tylwalk's treating medical providers. Instead, it relied on the documentation provided by those providers in order to make its determination. Joint Exhibit, pp. 000003-05. Prudential's Medical Director, Dr. Kowalski, based his recommendation that Tylwalk's claim be denied on the reports of Lingle and Dr. Catone.[7] *Id.*, pp. 000399-000400. The procedural anomalies that pervaded the insurance company's conduct in *Kosiba* are simply not present in this case.

In concluding that Prudential is entitled to summary judgment, the Court does not doubt the severity of Tylwalk's injuries. The evidence presented to the Court in this case indicates that she has

---

[7] The Court acknowledges that Dr. Kowalski apparently never saw Lingle's letter of March 23, 2004, in which Lingle contradicted his own prior statements. Joint Exhibit, p. 000399. Nevertheless, that letter contained no objective medical information. Instead, it was a conclusory statement designed to assist Tylwalk's case. Prudential's internal correspondence reveals that the company was aware of the fact that this letter was sent to Tylwalk's attorney in order to help Tylwalk in her efforts to obtain disability insurance benefits under the Social Security Act. *Id.* For this reason, Prudential appears to have been skeptical about the sincerity of Lingle's opinion. While this Court does not question the genuineness of any opinion expressed by Lingle, the inquiry in this case is whether Prudential acted in an arbitrary and capricious manner. Given the timing and circumstances of Lingle's March 23, 2004, letter, the Court cannot conclude that Prudential's decision to discount it amounted to arbitrary and capricious behavior.

sustained severe head injuries that will most likely limit her physical and mental abilities for the duration of her life. The narrow issue before the Court, however, is whether Prudential acted in an arbitrary and capricious manner. This is because the plan itself gives Prudential the *sole* discretion to interpret the terms of the contract, to make factual findings, and to determine eligibility for benefits. Document No. 10, pp. 3-4. Under these circumstances, the Court may not engage in a *de novo* review of Prudential's determinations. *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 210, 124 S. Ct. 2488, 2496, 159 L. Ed.2d 312, 328 (2004). Despite Tylwalk's allegations of bias, Prudential approved the continuation of her group life insurance in the amount of $89,000.00. *Id.*, p. 000015. The fact that Tylwalk was unable to obtain the $20,000.00 lump sum is an illustration not of bad faith or bias on the part of Prudential, but rather of the demanding nature of a standard based on both total and *permanent* disability. Accordingly, Prudential's Motion for Summary Judgment must be granted, and Tylwalk's Motion for Summary Judgment must be denied.

An appropriate Order follows.

19

**AND NOW**, this 28th day of September, 2006, this matter coming before the Court on the Plaintiff's Motion for Summary Judgment (Document No. 11) and the Defendant's Motion for Summary Judgment (Document No. 14), IT IS HEREBY ORDERED THAT the Plaintiff's Motion is DENIED and the Defendant's Motion is GRANTED.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

cc:    All Counsel of Record

20